IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 20-cr-40050-JPG |
| JEFFREY YORK, | |
| Defendant. | |

**<u>MEMORANDUM AND ORDER</u>**

This matter comes before the Court on defendant Jeffrey York's motion to compel discovery pertaining to a claim of selective enforcement and/or prosecution regarding the Federal Bureau of Investigation's ("FBI") "Operation Beach Apple" (Doc. 33). The Government has responded to the motion (Doc. 37), and York has replied to that response (Doc. 40).

**I.    Background**

York has been charged with attempted enticement of a minor to engage in criminal sexual activity in violation of 18 U.S.C. § 2422(b) (Count 1) and attempted use of interstate facilities to transmit information about a minor with the intent to entice a person to engage in criminal sexual activity in violation of 18 U.S.C. § 2425 (Count 2) (Doc. 17). The charges were the result of the FBI's "Operation Beach Apple" (hereinafter, simply "Beach Apple"), which York asserts in this motion violated the equal protection component of his Fifth Amendment due process rights. He believes Beach Apple, like other law enforcement sting operations relating to child sex crimes, unlawfully targeted men because of their sex and that, as a consequence, the Court must dismiss the charges against him. Importantly for the Court's analysis, he challenges the FBI's allegedly discriminatory investigation and referral for prosecution, but not the United States Attorney's decision to prosecute once the FBI referred his case. Def.'s Mot. 12 (Doc. 33).

In the pending motion, York seeks a raft of discovery regarding investigation and prosecution decisions to prove this theory. The Court sees no need to set forth verbatim each of his nineteen requests, which are available in his motion. A summary the categories of information he seeks relating to Beach Apple will do: a list of the criminal cases filed; personal information about and criminal history of those charged and those investigated but not charged; written justifications for arresting some but not other suspects; the number of and personal characteristics attributed to the fictitious minors used in the investigation; representations about the operation in funding proposals; participating law enforcement agents and what they were told about the operation; target selection policies and criteria; communications between law enforcement agents and targets; communications about the foregoing; undercover/sting/entrapment training materials and guidelines; internal oversight procedures; a detailed operation budget; and information about the approval of the operation. In his reply brief, York clarifies that at this point he simply wants the Court to begin an initial investigation into discriminatory enforcement and then proceed to more investigation if the initial investigation warrants it.

In support of his discovery request, York points to three things that he claims suggest a discriminatory effect and purpose of the Beach Apple investigation by the FBI: (1) the fact that all those prosecuted in Beach Apple and other sexual predator sting operations were men despite statistics showing a significant prevalence of female-perpetrated sexual victimization, (2) the undercover online profiles with whom the Beach Apple arrestees conversed were all straight girls or gay boys, who would be attractive only to men, and (3) the transcript of an FBI special agent's testimony stating that gay men tend to exchange photographs, sexual messages, and

2

sexual activity relatively quickly compared to the general population.

The Government maintains that the FBI's investigations of sex abuse offenses against minors took a gender-neutral approach that had neither a discriminatory purpose nor a discriminatory effect. It further argues that the established tests to justify conducting discovery regarding discriminatory enforcement or prosecution based on race do not apply to discrimination based on gender in the kind of operation that snared York and that, even if they did, York cannot satisfy those tests. The Government contends that the evidence York cites to show discriminatory intent is based on a misunderstanding of the facts regarding FBI agents' online profiles and the testimony of the FBI special agent's testimony, and that the evidence York cites to show discriminatory effect relies on statistical analyses of people not shown to be an appropriate comparison group. Finally, the Government argues that York's requests are fatally overbroad and seek privileged material.

**II.      Analysis**

The Court begins by setting up the framework it will use to decide this motion. It will first discuss the seminal Supreme Court case regarding discovery relating to allegations of selective *prosecution* on the basis of race—*United States v. Armstrong*, 517 U.S. 456 (1996)— and then turn to more recent precedent from the Court of Appeals for the Seventh Circuit relating to allegations of selective *enforcement* on the basis of race—*United States v. Davis*, 793 F.3d 712 (7th Cir. 2015). It will then address how these race discrimination precedents impact this Court's consideration of alleged gender discrimination and whether discovery is warranted in this case.

      A.      Legal Framework

The Court starts with the question of the appropriate standard for discovery when a defendant claims selective prosecution based on race, which was established in *United States v. Armstrong*, 517 U.S. 456 (1996).   To be clear, the *Armstrong* standard is applicable to claims that the Department of Justice discriminated on the basis of race when making prosecutorial decisions; it does not apply in the same way to claims that law enforcement agencies discriminated in deciding who to target or investigate or who to refer to the United States Attorney's Office for prosecution.   These are distinct stages of law enforcement activity, and the standard for one, while it may provide guidance, cannot be imported wholesale for the other.

      1.      Selective Prosecution Based on Race

In *Armstrong*, the Supreme Court held that in order to be entitled to discovery on a claim that a defendant was *prosecuted* based on *race*, the defendant must "show that the Government declined to prosecute similarly situated suspects of other races."   *Armstrong*, 517 U.S. at 458. In *Armstrong*, two defendants were charged in federal court with crack cocaine offenses.   *Id.* at 458-59.   They sought discovery and dismissal of the indictment on the basis that they were selectively prosecuted because they were Black.   *Id.* at 459.   In support of their arguments, they submitted evidence that in all of the 24 drug conspiracy cases closed in 1991 by the Federal Public Defender's Office in the district, the defendants were Black; that there were as many Caucasian drug users and dealers as there were minority users and dealers in the community; that many non-Black crack cocaine offenders were prosecuted in state rather than federal court; and that crack cocaine offenders, nearly all of whom were Black, were punished more severely than powder cocaine offenders.   *Id.* at 459, 460-61.

4

In examining the defendants' request for discovery, the *Armstrong* Court noted that the standard for proving selective prosecution is demanding and that there is a "'background presumption' that the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 463-64 (internal citation omitted). This is because a selective prosecution claim asks the Judicial Branch to exercise power over—and possibly impair the performance of—the Executive Branch, which is vested with broad discretion to enforce federal laws and which is more competent to evaluate legitimate factors that go into deciding whether to prosecute a case. *Id.* at 464, 465. Consequently, courts should presume prosecutors have properly discharged their official duties unless there is "clear evidence to the contrary." *Id*. at 464. Generally, so long as a prosecutor has probable cause to believe a defendant committed a crime, he or she has discretion whether to prosecute and which crime to charge, subject only to constitutional restraints, *e.g.*, he or she cannot base the decision on an impermissible factor such as race or religion in violation of the equal protection component of the Fifth Amendment Due Process Clause. *Id.*

To prove a selective prosecution claim, the defendant must "demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id.* at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Consistent with ordinary equal protection principles, "[t]o establish a discriminatory effect in a race case, the claimant must show that *similarly situated individuals of a different race were not prosecuted*." *Armstrong*, 517 U.S. at 465 (emphasis added) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (finding selective treatment where law was applied against Chinese nationals but not against non-Chinese people in the same situation); *Ah Sin v. Wittman*, 198 U.S.

5

500, 507-08 (1905) (rejecting selective prosecution claim where Chinese defendant did not show non-Chinese offenders were not prosecuted)). To establish discriminatory purpose, the defendant must show the Government "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987) (internal quotations omitted); *accord Wayte*, 470 U.S. at 610; *Chavez v. Illinois State Police*, 251 F.3d 612, 645 (7th Cir. 2001).

The *Armstrong* Court further held that because discovery for a selective prosecution claim is burdensome to the Government and may disclose its prosecution strategy, the standard is rigorous. *Armstrong*, 517 U.S. at 468. The Court therefore held that to obtain discovery a defendant must make "a credible showing of different treatment of similarly situated persons," a standard which "adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." *Id.* at 470. The Supreme Court thought this burden would not be insuperable if the claim of selective prosecution was well-founded. *Id.*

The *Armstrong* Court concluded that the admissible evidence offered by the defendants in that case was insufficient to merit discovery because it did not "identify individuals who were not [B]lack and could have been prosecuted for the offenses for which [defendants] were charged, but were not so prosecuted." *Id.*

        2.     <u>Selective Enforcement Based on Race</u>

As noted above, a prosecutor's charging decisions are not the same as law enforcement's investigative or referral decisions. The Court of Appeals for the Seventh Circuit addressed the law enforcement arena—called "selective enforcement" rather than "selective prosecution"—in *United States v. Davis*, 793 F.3d 712 (7th Cir. 2015). In *Davis*, the Court of Appeals held *en*

6

*banc* that in order to be entitled to discovery on a claim that a defendant was *investigated* or *referred for prosecution* based on race, the defendant must first give the Court a reason to believe race played a role in the investigation. *Id.* at 722. This showing would justify making limited inquiries into "whether forbidden selectivity *occurred or plausibly could have occurred.*" *Id.* at 723. The Court should then procced to a broader inquiry if the results of the limited inquiry justify it. *Id.*

In *Davis*, seven defendants—all Black—were charged in federal court with offenses arising out of a plan to rob a "stash house" where the defendants believed they would find drugs and money. *Id.* at 714. The stash house robbery idea arose after defendant Paul Davis repeatedly approached an FBI informant seeking suggestions for places to rob. The FBI passed information about Davis on to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), which then set up a sting by having an undercover FBI agent tell Davis about a fictional stash house that supposedly contained large amounts of cocaine. Davis recruited the other defendants to conduct the robbery, and all were arrested when they gathered to put the plan in motion. *Id.*

Davis and his cohorts sought extensive discovery regarding stash house stings, *see id.* at 721-22, on the basis that they were selectively investigated and prosecuted because they were Black in violation of their equal protection rights. *Id.* at 714-15. They argued that the FBI and ATF offered "lucrative-seeming opportunities" to Black and Hispanic individuals but not to similarly situated individuals of other ethnicities. *Id.* at 720. In support of their discrimination theories, they submitted evidence that in the twenty most recent stash house stings in the Northern District of Illinois, 75 of the defendants were Black and only 19 were White, and 13 of

7

the White defendants were Hispanic. *Id.* at 715. The district court relied solely on that evidence to grant the defendants' comprehensive discovery request. *Id.* at 719.

In reviewing the district court's decision, the Court of Appeals made clear that the prosecution statistics relied on by the district court were not sufficient by themselves under *Armstrong* to justify allowing the defendants discovery about prosecutorial decisions. *Id.* at 719-20, 722.

It then distinguished prosecutorial decisions like those involved in *Armstrong* from investigative decisions, and confirmed that, where law enforcement agencies discriminate based on race in who they investigate or refer to the United States Attorney for prosecution, they have violated the Constitution. *Id.* at 720. "[T]he fact that the United States Attorney may have prosecuted every case the agencies presented, or chosen 25% of them in a race-blind lottery, would not matter, since the constitutional problem would have preceded the prosecutor's role and could not be eliminated by the fact that things didn't get worse at a later step." *Id.* The Court of Appeals further noted that investigators are not protected by executive privilege and are not afforded the presumption of honest and constitutional conduct like prosecutors are when probable cause exists. *Id.* Consequently, different considerations are in play where discriminatory investigation and referral is alleged than were at play in *Armstrong*. *Id.* at 721.

Nevertheless, the Court found parts of the defendants' requests to be overbroad, namely, under *Armstrong*, those seeking information about the exercise of prosecutorial discretion and, under executive and/or deliberative process privilege, those seeking to reveal confidential orders given to criminal investigators. *Id.* at 722. Other requests sought information that was potentially discoverable, but the requests were fatally overbroad in that they could require

8

production of millions of documents and unduly bog down the agencies for years and could resulting in revelation of sensitive investigative criteria that would allow savvy criminals to evade detection . *Id.*

Nevertheless, the Court of Appeals noted that the racially disparate statistics were troubling and would be a legitimate reason for discovery. *Id.* It instructed the district court to begin by asking whether there was "any reason to believe that race played a role in the investigation" of the *Davis* defendants, such as, for example, whether law enforcement pursued the investigation where they would not have done so had Davis been White. *Id.* at 722-23. The defendants suggested they had additional evidence that they had not yet presented to the district court showing just that. *Id.* at 723.

The Court of Appeals advised the district court to receive this additional evidence "and then decide whether to make limited inquiries, perhaps including affidavits or testimony of the case agents, to determine whether forbidden selectivity *occurred or plausibly could have occurred*." *Id.* at 723 (emphasis added). If the limited inquiry gives the district court a reason to think similarly situated individuals of a different race would not have been investigated or, specifically in Davis's case, given the opportunity to conduct a stash house robbery, the district court could make further inquiries *in camera*. Those inquiries would look into the criteria for proceeding with investigations or targeting a suspect and law enforcement's compliance with that criteria. *Id.* If consideration of those factors suggests the suspicion of race discrimination is justified, the district could then "enlarge the probe" if new information suggests it is justified. *Id.* If a defendant's initial presentation does not justify limited inquiries into the possibility of discriminatory enforcement, "the district court could turn to the substance of the charges." *Id.*

9

### 3. *Armstrong*, *Davis* and Sex Discrimination

The Government distinguishes York's case from *Armstrong* and *Davis* because they assert different bases of discrimination. It is true that *Armstrong* and *Davis* were about discrimination on the basis of race, a classification justifying strict scrutiny, *Del Marcelle v. Brown Cty. Corp.*, 680 F.3d 887, 900, (7th Cir. 2012) (Easterbrook, J., concurring). Under that difficult standard, different treatment of races is justified only if it is narrowly tailored to achieve a compelling government interest. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). On the other hand, York's case is about alleged discrimination on the basis of sex, a classification justifying a lower level of scrutiny—intermediate scrutiny. Under that test, different treatment of sexes is justified if it is substantially related to an important government interest. *United States v. Virginia*, 518 U.S. 515, 524 (1996). That is still a demanding standard—there must be an "exceedingly persuasive justification" for purposeful gender discrimination, *id.*—but not as stringent as strict scrutiny.

But both kinds of discrimination require a showing of intent to discriminate; disparate impact alone is not enough. *See Washington v. Davis*, 426 U.S. 229, 242 (1976) (race). Thus, it is appropriate to require a defendant to point to some credible basis for finding discriminatory intent as part of a threshold test for discovery. *See United States v. Sellers*, 906 F.3d 848, 855 (9th Cir. 2018) (stating "a defendant must have *something* more than mere speculation to be entitled to discovery"); *United States v. Washington*, 869 F.3d 193, 221 (3d Cir. 2017) (stating "the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement"). Otherwise, any disparate impact would be a license for a fishing expedition regarding law enforcement and prosecutorial decisions. *United States v. Davis* suggests that an

allegation of race discrimination in law enforcement provides more leeway for discovery since the alleged perpetrators are not covered by the presumption of regularity or by some executive privileges, but some plausible suggestion of purposeful discrimination is still necessary before even allowing initial inquiries by the Court. *See United States v. Washington*, 869 F.3d at 221.

Furthermore, the *Armstrong* and *Davis* standards were established against a baseline assumption that racial classification in investigation and prosecutorial decisions would very likely not pass strict scrutiny—few racial classifications ever do—so merely showing such classification is a major step toward proving unlawful discrimination.[1]  So it is understandable that merely pointing to evidence of race discrimination would lead to a legitimate basis for further inquiry.  Not so with sex discrimination.  It is easier to pass the intermediate scrutiny test applicable to sex discrimination claims because even intentionally different treatment of men and women is lawful as long as the different treatment is substantially related to an important government interest.  Thus, evidence suggesting different treatment does not go as far in proving sex discrimination as it does in proving race discrimination.  This suggests the standard for discovery should be *more* demanding in the sex discrimination context.

The Court need not flesh out exactly what showing a defendant must make before the Court will allow discovery into investigative or referral decisions by law enforcement based on sex because, other than showing a statistical disparity, York has not given the Court any reason to believe sex played a role in his investigation or referral for prosecution.  He has not made the threshold showing *Davis* requires.[2]

---

[1] Perhaps this is why, as York points out in his reply brief, none of the cases addressing selective enforcement based on race discussed the strict scrutiny standard; it was obvious that if purposeful discrimination occurred, it would fail the test.

[2] The Court need not speculate on whether, had the FBI targeted men in their child sex offense

B. <u>Application to York</u>

While it is true that FBI decisions have resulted in a decidedly one-sided impact on men—100% of the prosecution in this district for federal sex offenses involving minors have been men—that is the only thing his evidence shows. And as *Washington v. Davis* held, a disparate impact alone is not enough alone to prove, much less suggest, discriminatory intent or purpose. This is especially true upon close examination into law enforcement decisions about York and the evidence to which York points in support of his belief that sex discrimination occurred as well as a plausible alternative explanation for the disparity. In sum, York's proffer has not given the Court "any reason to believe" his sex played a role in his investigation or referral for prosecution. *See United States v. Davis*, 793 F.3d at 722.

1. <u>Studies of Prevalence of Women Perpetrating Sex Abuse</u>

York first argues that the vast disparity between men and women investigated and prosecuted in Beach Apple indicates intentional discrimination when viewed against the relative equal prevalence of men and women sex abusers in the population generally. Under his theory, if men and women are equally likely to commit sex abuse crimes, there should be a more equal representation in the list of federal criminal defendants. *See United States v. Olvis*, 97 F.3d 739, 745 (4th Cir. 1996) (noting that study showing disparity in prosecutions would only be relevant to showing discrimination if it assumed violations committed in the same proportion by all races). York points to an article examining several studies showing sex abuse perpetrated by women is not uncommon (Doc. 33-10). *See* Lara Stemple et al., *Sexual victimization perpetrated by women: Federal data reveal surprising prevalence*, 34 Aggression and Violent

---

investigations, any discrimination would have been justified as substantially related to an important government interest.

Behavior 302-11 (2017).

That article and the others cited by York do not supply the evidence required to suggest sex discrimination in York's case.  First, far from showing men and women commit sex offenses at similar rates, the Stemple article merely concludes that women constitute a significant proportion of sex abuse perpetrators, and that sex abuse by women occurs more often than traditionally assumed and is underreported to officials.  The article discusses limited data on the relative percentage of sex offenders by gender, and the data it does provide is in some circumstances consistent with a vastly larger prevalence of sex abuse by men than by women. In fact, the article notes that the National Crime Victimization Survey of households (*i.e.*, not including correctional/residential facilities) suggests men alone commit approximately 90% of sex abuse, *id.* at 305, Fig. 2[3], which renders the Beach Apple defendant pool of 100% men less jarring and consistent with United States Sentencing Commission ("U.S.S.C.") statistics showing 94.2% of federal sex offenders in 2019 are men.  U.S.S.C. Quick Facts—Sexual Abuse Offenders (May 2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Sexual_ Abuse_FY19.pdf (visited Mar. 10, 2021).

Second, the Stemple article examines sex abuse generally—"female sexual perpetration in the U.S.," *id.* at 303—not limited to sex abuse of children that has a nexus to interstate commerce, the population of offenders investigated by the FBI in Beach Apple.  Indeed, the sex abuse perpetrated by women cited in the article often occurred against "men" and occasionally against "women" (presumably not minors) and/or in the domestic context, or it occurred in the

---

[3] Other environments such as juvenile detention facilities reveal different percentages, but those environments are not used in operations like Beach Apple.

13

residential/correctional facility context (more frequently against minors)[4] and would not necessarily be subject to federal prosecution. Gender comparisons of sex abuse generally shed little light on whether bias might exist in investigation of sex offenders eligible for federal prosecution because they seek to abuse children using means with a nexus to interstate commerce. In sum, while the Stemple article sheds new light on sexual abuse perpetrators generally, it does *not* say—or even suggest—that federal crimes involving sex abuse of minors are committed proportionately by all sexes.

        2.    <u>Online Profiles</u>

York next contends that the FBI's decision to have its online certified employees ("OCEs," the agents posing online as minors) use straight girl or gay boy fake profiles is circumstantial evidence that the operation targeted men, those likely to be attracted to those profiles. York speculates that no OCEs ever posed as a lesbian girl or straight boy, the kind of profile likely to be attractive to women. He, in fact, was caught by his response to an OCE posing as a straight girl.

A close examination of the events leading to York's arrest revealed no circumstances suggesting he, or any other man, was targeted because of his sex. The OCE posted an ad using the "missed connections" part of the classified ad service of Craigslist, a website with a broad audience not focused particularly on men, women, or sexual activities. The OCE used a gender-neutral identifier—"Bored"—and conveyed a gender-neutral suggestion that Bored would do "favors" for money. Without giving any clue about his own sex, York responded as "stealth mode" and asked about Bored's sex, and without knowing York's sex, Bored assumed a female

---

[4] Two studies specifically mentioned "intimate partner" violence, and two others were in the context of juvenile facilities.

14

identity. Still without giving a hint about his own sex, York continued the conversation. Four days later, after exchanging several messages, Bored revealed she was 15 years old, and York continued in the "dating dialogue," as the Government euphemistically calls it.

By this point, the circumstances do not suggest that the FBI did or said anything that would tend to attract men rather than women. Bored's first Craigslist post was completely neutral. Once she represented she was a 15-year-old girl, either a lesbian woman or a straight man interested in an underage girl would be equally interested. But York was first on the scene, so the investigation continued against him. Once he self-selected as a target, the OCE continued to develop a profile that the agent thought would interest him, and once he took steps to travel to see Bored, he was arrested. There is nothing to suggest that the FBI would not have done the same thing for a woman who responded to Bored's ad and then traveled to try to see him or her. On the contrary, it appears its pursuit of York instead a woman was simply due to the fact that no woman responded before York did, not because York was a man.

        3.      <u>FBI Special Agent Michael Carter's Testimony</u>

York points to the testimony of Special Agent Carter in a case in the Central District of Illinois as circumstantial evidence that the FBI targeted men in Beach Apple. In his testimony, Special Agent Carter agreed that, in his experience in sting operations on gay dating websites, adult gay men commonly engage in exchanging photographs, sexual messages, and sexual activities more quickly than those in the general community. The Court is hard-pressed to see how this suggests the FBI's investigation and referral of York unlawfully discriminated because of his sex. He has not given any indication he is a gay man, and the sting that netted him was not on a website that focused on gay dating. Other than to demonstrate that Special Agent

15

Carter has formed opinions about patterns of behavior in prior sting operations, his observations simply do not shed any light on York's case.

### 4. Law Enforcement Operations Order

York argues that the thoroughness of the Law Enforcement Operations Order setting forth specifics of Beach Apple demonstrates the FBI was so competent that its successful arrests of only men proved it was targeting only men to begin with. With all due respect to the agency, it strains credulity to assert that the FBI—or any other government agency, for that matter—always intends operations to turn out as they do.

### 5. Possible Alternative Explanation for Disparity

The Court's conclusion that York has not pointed to "any reason to believe that [sex] played a role in the investigation," *Davis*, 793 F.3d at 722, is supported by a plausible alternative explanation for the statistical disparity in the Beach Apple defendant population. First, it is clear from the articles and studies York cites that the prevalence of sex abuse perpetrated by men and women varies with the setting. Stemple broadly observes that the relative prevalence varies depending on the sex, age, and sexual orientation of the victim, the relationship between the perpetrator and the victim, the type of sexual abuse committed, and whether the abuse was in or out of a correctional facility or detention center. So it would be completely plausible that the prevalence of male defendants charged with the types of crimes the FBI investigates with its sting operations is due simply to the prevalence of men who commit that kind of crime in the first place—online "dating dialogue" with minors not in custodial facilities that leads to an attempt to meet with the intention of having unlawful sexual contact, all in violation of federal law. Had the sting been conducted in a male youth detention facility with women guards or in

16

the context of an intimate partner relationship, the Stemple article suggests the rates of investigation and referral of women should be higher. But Beach Apple was not such a sting—likely because the youth detention center crimes and intimate partner violence are unlikely to be federal crimes within the jurisdiction of the FBI. York has pointed to no evidence suggesting that this alternative explanation for the disparate impact on men is implausible.

Additionally, the Court's conclusion is consistent with the U.S.S.C.'s findings from 2019 showing that 94.2% of those who were convicted of committing federal sex offenses of any kind were men.[5] U.S.S.C. Quick Facts—Sexual Abuse Offenders (May 2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Sexual_Abuse_FY19.pdf (visited Mar. 10, 2021). The Court is unwilling to presume these statistics are unrepresentative of the actual offender pool without more evidence. In other words, it is plausible that Beach Apple yielded only male criminal defendants because it is likely that the vast majority of those eligible to be fruitfully investigated, arrested and prosecuted for those crimes were male.

      6.     Selective Prosecution

York insists that he is only making a selective enforcement, not a selective prosecution, claim. However, he requests some discovery relating to prosecutorial decisions, so the Court will say a quick word about that. It is clear that York has not made the demanding threshold showing of discrimination required for discovery established by *United States v. Armstrong*, 517 U.S. 456 (1996), and applied in *United States v. Bass*, 536 U.S. 862 (2002) (*per curiam*), to

---

[5] The Court realizes that this reasoning is somewhat circuitous: more men were convicted. . . because the FBI investigated and referred more men. . . because more men committed the crimes rather than, as York would have it, the FBI was looking for only men. York's theory would require a vast conspiracy among nationwide law enforcement offices to specifically target men and ignore women, which the Court does not find plausible.

potentially discriminatory prosecution decisions. The statistical evidence that a prosecution policy has a disparate impact on a particular group, without evidence that individuals similarly situated to a defendant were actually treated differently, is insufficient to make the required showing, and York has not pointed to any women similarly situated to him in relevant ways who were not investigated or referred for prosecution.

### III.     Conclusion

For the foregoing reasons, the Court **DENIES** York's motion for discovery relating to selective enforcement as well as his request for the Court to conduct initial inquiries into the allegation (Doc. 33).

**IT IS SO ORDERED.**
**DATED:   March 18, 2021**

                                            s/ J. Phil Gilbert
                                            **J. PHIL GILBERT**
                                            **DISTRICT JUDGE**